# UNITED STATES DISTRICT COURT
## for the
### Eastern District of California

**FILED**

**Dec 21, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of )
)
)
Angel Jesus Sanchez-Manriquez )
)
)

Case No.   2:20-sw-1156-DB

# SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591(a)(1) | Sex Trafficking of a Child |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☐ Continued on the attached sheet.
☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Rachel Johnston
*Applicant's signature*

Rachel Johnston, FBI Special Agent
*Printed name and title*

Sworn to before me telephonically pursuant to Fed. R. Crim. P. 4.1.

Date:   12/19/2020

City and state:   Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

1   McGREGOR W. SCOTT
United States Attorney
2   BRIAN A. FOGERTY
Assistant United States Attorney
3   501 I Street, Suite 10-100
Sacramento, CA 95814
4   Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

5

6   Attorneys for Plaintiff
United States of America
7

8                    IN THE UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:              CASE NO.

12  The Locations Described in Attachments A-1    AFFIDAVIT IN SUPPORT OF AN APPLICATION
    through A-3                                  UNDER RULE 41 FOR WARRANTS TO SEARCH
13                                               AND SEIZE

14

15

16      I, Rachel Johnston, being first duly sworn, hereby depose and state as follows:

17              I.        **INTRODUCTION AND AGENT BACKGROUND**

18      1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

19  Criminal Procedure for warrants to search the premises known as:

20      a)      2224 East Lafayette Street, Stockton, California (hereinafter, the "2224 E. Lafayette

21              Residence") identified in Attachment A-1 for things described in Attachment B;

22      b)      Garage building located directly behind 2226 East Lafayette Street, Stockton, California

23              (hereinafter, the "Garage Building") identified in Attachment A-2 for things described in

24              Attachment B; and

25      c)      The person known as Angel Jesus Sanchez-Manriquez, further described in Attachment

26              A-3, for the things described in Attachment B.

27      2.      I am I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and am

28  authorized to request a search warrant pursuant to Rule 41(a)(2)(C) of the Federal Rules of Criminal

Procedure.  I have been an FBI Special Agent since February 2018.  I joined the FBI in 2013.  Prior to becoming a Special Agent, I worked as a Management and Program Analyst in the Security Division, Resource Planning Office and Counterterrorism Division.  I am currently assigned to the Sacramento Division, Chico Resident Agency.

3.	My law enforcement training includes twenty-one weeks of basic training at the FBI Academy in Quantico, Virginia.  A portion of this training was dedicated to learning how to use computers and the Internet in order to investigate computer-related crimes.  Some of my investigative responsibilities include investigation of child exploitation, national security, violent crimes, murders, bank robberies, drug trafficking and manufacturing, and firearms violations.

4.	The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.	Based on the facts set forth in this affidavit, I submit that there is probable cause to believe (i) that violations of 18 U.S.C. § 1591(a)(1), Sex Trafficking of a Child, have been committed by Sanchez-Manriquez, and (ii) that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, will be found in the places identified in Attachments A-1, A-2, and A-3.  Thus, the search warrant for which I am applying would authorize law enforcement agents to search the locations described in Attachments A-1 through A-3 to seize the items described in Attachment B.

## II.	BACKGROUND REGARDING SEX TRAFFICKING

6.	Through my training and experience, I am aware of the following traits of prostitution as well as how the Internet and mobile telecommunications technology are used to further illegal prostitution:

a)	Individuals who, through enticement, intimidation, or force, enlist other individuals to become prostitutes, and who profit from the prostitution of others, are called "pimps."

b)	Pimps, as well as prostitutes, use the Internet as a means of advertising services and communicating with customers.

c)      Pimps often try to recruit new victims by using social media Internet tools such as Facebook.com, Instagram, and Snapchat.  Pimps often communicate with victims via social media applications after recruiting a victim to work for them.  Prostitutes working for the same pimp will often use social media to communicate with each other and their pimp.

d)      Certain websites facilitate communications between prostitutes and their clients.  The more notable websites formerly relevant to prostitution in the Eastern District of California include the "Adult" section of Backpage.com as well as nightshift.co.  New escort websites include Skipthegames.com, CityXGuide.com, Megapersonals.com, and Adultlook.com.  These websites allow pictures to be posted as part of advertisements for illegal prostitution services.  In the course of my career, I have viewed numerous prostitution advertisements on each of these websites and am familiar with such advertisements' terminology, layout, and structure.

e)      Pimps attempt to avoid the attention of law enforcement through the anonymity provided by the Internet.

f)      Prostitutes are instructed by the pimp on how to detect undercover officers.  When arranging "dates" with clients over the phone, prostitutes rarely discuss the details regarding the sexual acts that are to occur.  Those more detailed discussions typically occur when the prostitute and client meet in person.

g)      Pimps at times use physical force, threats of physical force, and/or fear to control prostitutes.  They control the prostitutes' actions, and collect money earned through acts of prostitution.  Pimps facilitate prostitution by transporting the prostitutes to locations where the prostitution occurs.  The pimps, at times, transport prostitutes across state lines for the purpose of prostitution.

h)      Prostitutes and/or pimps often stay in motels and hotels while traveling.  Prostitutes and pimps travel via rental vehicle, airplane, or bus during their travels.  Pimps utilize the monies earned during acts of prostitution to purchase

food, lodging, clothing, and other items.

i)       Pimps sometimes possess firearms to facilitate their sex trafficking.

j)       Pimps often provide drugs to prostitutes to suppress their appetites and to help prostitutes cope with the demands of performing sex acts for long periods of time.

k)      The term "daddy" is commonly used by prostitutes when referring to their pimps. The pimp's phone number is often programmed as "daddy" in prostitutes' cellular phones.

l)       Pimps often request or force their prostitutes to obtain tattoos of names and/or symbols that are related to the pimp's name or nickname.

m)     Prostitutes use cellular telephones as a way to communicate with clients. The call numbers associated with these cellular phones are frequently included in advertisements posted on various websites that facilitate prostitution, including those websites referred to earlier in this affidavit. Prostitutes, pimps, and clients communicate via voice calls, text messages, and messages over social media platforms.

n)      Pimps and prostitutes use cellular telephones to transmit photographs to email accounts and/or prostitution advertisement websites.

o)      Pimps and prostitutes use personal email accounts to post their advertisements on websites advertising prostitution services.

## III.    PROBABLE CAUSE

**A.**    **A.G. Contacted a Person Using a Telephone Number Found on Online Prostitution Advertisements That Include Photos of A.G.**

7.     On November 12, 2020, Yuba County Sheriff's Office Detective Natalie Mullins contacted me concerning A.G.[1] Detective Mullins informed me that on or around November 9, 2020, while in law enforcement custody at Juvenile Hall in Yuba County, A.G. asked staff at Juvenile Hall to place a telephone call to her stepfather. A.G. provided Juvenile Hall staff with her purported

---

[1] A.G.'s true name and date of birth are known to law enforcement. On November 12, 2020, A.G. was sixteen years old.

stepfather's telephone number:  209-420-2671.  A.G. further requested that the Juvenile Hall officer

initiating the call ask for her grandfather, who she identified as "Angel."

8.     The Juvenile Hall officer successfully contacted a person using the number provided by

A.G. and allowed A.G. to speak to the person on the other end of the line.  While A.G. was on the

telephone, the Juvenile Hall officer overheard A.G. refer to the person on the other end of the line as

"baby" or "babe."  The officer terminated the phone call.

9.     The Juvenile Hall officer conducted a Google search of the number.  This search revealed

that 209-420-2671 was listed as the contact telephone number on multiple online advertisements for

prostitution services, some of which contained a photograph of A.G.

**B.**     **A.G's Photograph Appears on Dozens of Online Posts Advertising Prostitution Services**

10.     On November 13, 2020, I searched for and viewed advertisements on Skipthegames.com,

in a section of the website titled "California," subsection "Stockton," subsection "Female Escort."  I

located over seventy separate and distinct advertisements bearing titles such as, "Snow Bunny in

Stockton."

11.     Each such advertisement for "Snow Bunny in Stockton" contained a photograph

depicting a white female in her underwear, as well as a photograph of A.G.  Many of the advertisements

included a photograph of A.G. that she took of herself (i.e., a "selfie") in a light pink, off-the-shoulder

top, with her hair pulled back.  In this photograph, a large tattoo depicting a flower, a locket, and the

word "kilo" was visible on A.G.'s right chest.  Of the over seventy advertisements that I viewed on

November 13, 2020 all but two included contact call number 209-420-2671.[2]  Each advertisement listed

A.G.'s age as nineteen years old.  The text of each advertisement varied based on whether A.G. was

---

[2] One advertisement of A.G. posted to SkiptheGames.com on October 8, 2020, listed the contact telephone number as 916-822-9487.  Based on subscriber information provided by Pinger, telephone number 916-822-9487 is a voice over Internet protocol (VOIP) created to communicate on the cell phone application TextFree. According to Pinger, the username for the subscriber of telephone number 916-822-9487 is Amanriquez29320.  This VOIP telephone number was active between September 20, 2020 and November 10, 2020.  One advertisement of A.G. posted to SkiptheGames.com on October 14, 2020, listed the contact telephone number as 209-639-9025.  Based on evidence gathered during this investigation, I know that A.G's cellular telephone is assigned the call number 209-639-9025.  When I searched A.G.'s cellular telephone pursuant to a federal search warrant, I discovered no evidence of that the device accessing SkiptheGames.com.

available for an in-call, out-call, or car date.[3]  Some advertisement did not list her availability at all.

Some advertisements included a list of things A.G. was not willing to do.  At the bottom of an

advertisement posted on October 8, 2020 the following is listed; "NO BB NO BBBJ NO GFE NO

GREEK D."  Although the advertisements varied, each included the following content:

> Hey my name is Alexis and I am located in Stockton ☺ let me please you
> in any way I could 🐱 call or Text (phone number) for more info.
> 🚫🚫🚫👺♀ 👺👺♂

12.     Based on my training and experience, I know that "BB" means "bareback" or to engage

in sex without a condom; "BBBJ" means to perform oral sex without a condom; and "Greek" means to

have anal sex.

13.     On November 17, 2020, I interviewed A.G. at Juvenile Hall.  I showed A.G. a copy of the

"selfie" described above, and A.G confirmed that she is the person depicted in that photograph.  During

this interview, A.G. also confirmed that she had recently turned sixteen years old.

**C.     209-420-2671 Belongs to Sanchez-Manriquez.**

14.     I performed searches of various public and employment records.  These searches revealed

to me that the call number 209-420-2671 belongs to Sanchez-Manriquez and is associated with an

AT&T cellular telephone account.  According to AT&T records, an individual named Yesenia

Manriquez paid the bill for this account between March 2020 and October 2020.  AT&T records also

indicate that Yesenia Manriquez is also a "top contact" for the account associated with 209-420-2671.

According to Stockton Police Department probation information, Sanchez-Manriquez's mother is

Yesenia Manriquez.

15.     I interviewed A.G.'s mother on December 1, 2020.  A.G.'s mother told me that on or

about November 8, 2020, A.G.'s mother began communicating with a person she knew as Angel via text

message.  A.G.'s mother reported that Angel was using a phone assigned the call number 209-420-2671

to send and receive text messages with A.G.'s mother.  Angel identified himself to A.G.'s mother and

informed A.G.'s mother that he wanted to give A.G.'s mother $2,000 in cash that he claimed belonged

---

[3] Based on my training and experience, I know that an "in-date" is when a prostitution customer travels to the sex worker for the encounter; and "out-call" is when the sex worker travels to the prostitution customer to perform the sexual encounter; and a "car date" is when the sexual encounter occurs in a vehicle.

1  to A.G., as well as some of A.G.'s personal belongings.[4]

2       16.    A.G.'s mother further informed me that after A.G. contacted Angel from Juvenile Hall,

3  on or around November 12, 2020 the tone of Angel's text messages to A.G.'s mother changed.

4       17.    On November 9, 2020, a person using telephone number 530-638-2760 sent a text to

5  A.G's mother, in which the person identified himself or herself as "Jen," a neighbor.  Jen told A.G.'s

6  mother that a Hispanic kid asked to use her phone because he had A.G.'s belongings and wanted to give

7  them to her.  A.G.'s mother did not respond.  On November 19, 2020, a person using telephone number

8  530-638-2760 sent A.G's mother a short video that depicted two people in the front seat of a car holding

9  Glock-style firearms.  The following text message exchange took place after the video was sent:

10          530-638-2760: Come out [A.G.'s mother's first name] I have a message, I'm outside [name of apartment building] ☺

11
12          A.G.'s mother: Lol I'm outside. U don't scare me with gun threats. Are u threatening my life?

13          530-638-2760: Come walk to the alley behind McDonald's. I never enforced a thread

14
15          A.G.'s mother: What u gonna murder me over me not wanting my Daughter to get screwed over?

16          530-638-2760: I heard your interfering with business I wa so my sent to give u a message

17
18          A.G.'s mother: Who is this even?

19          530-638-2760: My nephew is to not be fucked with. Small fries like u get plucked for less. My nephew said you daughter is lowing and u continue to bug him

20
21          A.G.'s mother: I'm not fucking With no one he just has $2,000 of daughter's money that's all.

22          530-638-2760: Your daughter doesn't have money

23          A.G's mother: I just asked for her clothes and her money she worked for that's it. I don't want no problems but I will stand up for Baby girl.

24
25          530-638-2760: Is your life worth listening to your daughters lies? Yes or No. I don't want no answer besides yes or no.

26          A.G.'s mother: Look I known what ur about I'm just making sure my

27

28     [4] A.G.'s mother also informed me that in the course of her text message exchange with Angel in early November 2020, Angel told her that A.G. had been residing with Angel for around two months.

1    daughter don't get screwed over that's it.

2    530-638-2760: Your daughter has nothing with us. Your daughter used us

3    and u continue to escalate these problems. Now tell me.

4    A.G.'s mother: I asked him nicely he was the one that was threatening my life over some shit I'm not scared of a gun

5    530-638-2760: Is your life worth losing over your daughter lies? Yes or no. Tell me

6    18.    Based on subscriber information provided by Pinger, telephone number 530-638-2760 is a VOIP number created to communicate on the cell phone application TextFree. According to Pinger, the name of the account is "Angel" and the username is "Angelsm99." This VOIP telephone number was created on November 9, 2020 and is still active as of December 4, 2020.

**D.    <u>Additional Facts Connecting A.G. to Sanchez-Manriquez and Prostitution.</u>**

19.    In or around November 2020, Detective Mullins gave me three photographs of A.G. that I had not previously seen. Two of these photographs include a Hispanic male. I believe Sanchez-Manriquez is the Hispanic male depicted in the photographs that Detective Mullins gave me because I compared his California driver's license photograph to the person depicted in the photographs with A.G. Based on the similar physical appearance of the individuals depicted in the photos, I concluded that the two photos depicting a Hispanic male actually depict the same person: Sanchez-Manriquez.

20.    On December 8, 2020, the Honorable Allison Claire issued search warrant number 2:20-sw-01115-AC, which authorized the search of the Apple iPhone cell phone A.G. possessed at Juvenile Hall. Pursuant to that search warrant, I conducted a search of A.G.'s iPhone, which was activated on or around October 13, 2020. During my review of A.G.'s iPhone, I found multiple images of A.G. and Sanchez-Manriquez posing together in bed. In at least one of these photographs, A.G. is partially nude.

<u>Text Messages From A.G.'s iPhone.</u>

21.    While searching A.G.'s iPhone, I viewed a text message exchange between A.G. and a so-far-unidentified prostitution customer that occurred on November 7, 2020. In summary, A.G. and this unidentified prostitution customer attempted to schedule a "date"—or prostitution encounter—for November 8, 2020, between 9:30 a.m. and 10:00 a.m. The date texted "would you do it for $100?" A.G. responded "yes." A.G. told the prostitution customer that the date would take place in room 227 at

1    the Motel 6 located at 6717 Plymouth Road in Stockton, California.

2          22.    At 10:02 a.m. on November 8, 2020, A.G. and Sanchez-Manriquez, who was saved in

3    A.G's device under telephone number 209-420-2671 as "Angel," engaged in the following iMessage

4    exchange:

5          Sanchez-Manriquez:   Ima have my black homies in room 225 go get u.
             They been watching u. If u don't answer.

6          A.G.:   Nigga I have a trick rn. He's coming.[5]

7          Sanchez-Manriquez:   I have one going too

8          A.G.:   And tbh I would have paid but I put them in the toilet.

9          Sanchez-Manriquez:   I'm calling hotel security to kick u out

10         A.G.:   And okay. For what I didn't do shit.

11

12         23.    During my review of A.G.'s phone, I also found Google searches for hotels in Stockton

13   California, and screenshots of hotels in that area.  On October 13, 2020 and October 14, 2020, A.G.'s

14   phone was connected to the WiFi at a Days Inn.  On November 2, A.G.'s cell phone was connected to

15   the WiFi at a Rodeway Inn.  On November 7, 2020, A.G.'s cell phone was connected to WiFi named

16   "Yesenia," which is Sanchez-Manriquez's mother's first name.

17         24.    On an unknown date and time, A.G. engaged in a text message conversation with a

18   contact saved in her iPhone as "Chupo."  This exchange proceeded as follows:

19         Chupo:I kno u probably like what u do but honestly u a pretty as girl and u
             don't have to do wat ur doing. U can get a job a be koo. Its not like ur
20            doing it for u so think about that go home be good get a boyfriend that
             loves u and don't just want to take yo cheese. U hella koo and u should be
21            happy. Stop doing them pills homie bad for u.

22         A.G.: I don't really like what I'm doing I only do this cuz angel started
             into getting me to do this I've never done it for money and shit and thank
23            u but u got what u wanted me and him aint together so I hope u happy.
             Take care of him. And I right. U*

24

25

26

27

---

28    [5] Based on my training and experience, I know that that in the prostitution industry, the term
     "trick" refers to a prostitution customer.

AFFIDAVIT                                            9

Subscriber Information Connecting Sanchez-Manriquez's Prostitution Operation
to Sanchez-Manriquez's Residence.

25.     On November 16, 2020, a representative of SkiptheGames.com provided subscriber information (including Internet Protocol ("IP") addresses) for the user who posted prostitution advertisements containing A.G.'s photograph.  According to these records, the user who posted these advertisements logged into Skipthegames.com from an account associated with the call number 209-420-2671 and associated with the email address angelosmithx4@gmail.com.[6]

26.     Comcast records indicate that five of the IP addresses from which advertisements of A.G. were posted to SkiptheGames.com were assigned by Comcast to Yesenia Manriquez as follows:

   a)     2601:203:c200:a3e0:751d:7159:ce43:9964 (assigned on November 4, 2020);

   b)     2601:203:c200:a3e0:9065:9eb7:3620:b3b4 (assigned on November 4, 2020);

   c)     2601:203:c200:a3e0:111d:70fc:a0e8:cd19 (assigned on November 4, 2020);

   d)     2601:203:c200:a3e0:fcf3:1e26:cb1f:a702 (assigned on November 6, 2020); and

   e)     2601:203:c200:a3e0:2ddf:e21f:1c3e:55dd (assigned on November 6, 2020).

27.     The address of service provided by Comcast for these five IP addresses on these dates was 2224 East Lafayette Street, Stockton, California (i.e., the 2224 E. Lafayette Residence).

28.     Based on searches of open-source data, I determined that AT&T Mobility provided all the remaining IP addresses from which advertisements of A.G. were posted to SkiptheGames.com. Based on my training and experience, I know this to mean that these remaining IP addresses were used by an AT&T subscriber to access the Internet from a mobile device such as a cellular telephone.  AT&T does not maintain records connecting mobile IP addresses of this type to particular devices or accounts. As set forth above, the AT&T account associated with call number 209-420-2671 is paid for by Yesenia Manriquez.

///

///

---

[6] I believe that the Google email address angelosmithx4@gmail.com is at times being used by an individual named Angelo Smith.  On September 27, 2020, officers from the Stockton Police Department conducted a traffic stop of a vehicle in which Sanchez-Manriquez and Smith were both passengers.

<u>Sanchez-Manriquez lives at 2224 E. Lafayette Residence.</u>

29.     Sanchez-Manriquez is currently on probation ordered by a San Joaquin County Superior Court Judge.  According to records provided to me by the Stockton Police Department, Sanchez-Manriquez's residence address for purposes of his probation is the 2224 E. Lafayette Residence.

30.     According to records maintained by the California Department of Motor Vehicles, the 2224 E. Lafayette Residence is Sanchez-Manriquez's address on his California driver's license, which was last updated on January 28, 2020.

31.     On December 16, 2020, officers from the Stockton Police Department conducted surveillance of the 2224 E. Lafayette Residence.  During surveillance, officers observed Sanchez-Manriquez in the Garage Building that abuts the 2224 E. Lafayette Residence.  The Garage Building is shared by 2224 and 2226 E. Lafayette Street.  Sanchez-Manriquez's maternal grandparents reside at 2226 E. Lafayette Street.

**E.     <u>A.G.'s Mother Recently Reported Her Missing.</u>**

32.     On December 19, 2020, A.G.'s mother informed me that A.G. left her home on the evening of December 18, 2020.  A.G.'s mother reported that she has not had contact with A.G. and does not know where A.G. went.

33.     On December 14, 2020, this Court authorized the collection of precise location data concerning Sanchez-Manriquez's cell phone that is assigned telephone number 209-420-2671.  AT&T has provided location data for that cell phone, which indicates that on the morning of December 19, 2020, the device traveled from the vicinity of Stockton, California—the location of the 2224 E. Lafayette Residence and Garage Building—to Willows, California.  A.G.'s mother resides in Willows, California.  The location data also indicates that the device stayed in Willows for approximately 30 minutes, then began traveling south on Interstate 5 in the direction of Stockton, California.

**IV.     <u>TECHNICAL TERMS</u>**

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a)  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  Typically, an IP address looks like a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Other forms of IP addresses, such as IPv6, may express IP addresses differently. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c) Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## V.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the places identified in Attachments A-1 through A-3, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.     *Probable cause.* I submit that if a computer or storage medium is found in the place identified in Attachments A-1 through A-3, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.

This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d)  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the location identified in the Attachments because:

a)  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store

configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both

show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f)   I know that when an individual uses a computer to manage the prostitution activity of a minor, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

38.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a)   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b)   Technical requirements.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c)   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40.   Because several people share the 2224 E. Lafayette Residence and Garage Building as a residence, it is possible that these premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VI.    CONCLUSION

41.   I submit that this affidavit supports probable cause for a warrant to search the locations described in Attachments A-1 through A-3 and seize the items described in Attachment B.

## VII.    REQUEST FOR SEALING

42.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I

1  believe that sealing this document is necessary because the items and information to be seized are

2  relevant to an ongoing investigation into the criminal organizations as not all of the targets of this

3  investigation will be searched at this time.  Based upon my training and experience, I have learned that

4  online criminals actively search for criminal affidavits and search warrants via the Internet, and

5  disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online

6  through the carding forums.  Premature disclosure of the contents of this affidavit and related documents

7  may have a significant and negative impact on the continuing investigation and may severely jeopardize

8  its effectiveness.

9

10                                                                  Respectfully submitted,

11                                                                   /s/ Rachel Johnston

12                                                                  Rachel Johnston
                                                                    Special Agent
13                                                                  Federal Bureau of Investigation

14

15  Subscribed and sworn telephonically
    on:                                                       12/19/2020
16

17

18

19
    DEBORAH BARNES
20  UNITED STATES MAGISTRATE JUDGE

21
    /s/ Brian A. Fogerty
22  Approved as to form by:
    Assistant U.S. Attorney Brian A. Fogerty
23

24

25

26

27

28

## ATTACHMENT A-1

The property to be searched is 2224 East Lafayette Street, Stockton, California (i.e., the "2224 E. Lafayette Residence"), including the residential building, any outbuildings, and any appurtenances thereto, any cell phone, computer or storage medium found therein, and any person located at the property.   The property is a brown stucco house with a white front door, as depicted below:



## ATTACHMENT A-2

The property to be searched is a garage building that abuts the residence at 2226 East Lafayette Street, Stockton, California (i.e., the "Garage Building"), including the residential building, any outbuildings, and any appurtenances thereto, any cell phone, computer or storage medium found therein, and any person located at the property.   The property is depicted below:



## **ATTACHMENT A-3**

The person to be searched is Angel Jesus Sanchez-Manriquez, date of birth April 7, 1999, including any containers, cell phones, computers or storage medium found thereon.  Set forth below is a photo of Angel Jesus Sanchez-Manriquez:



# ATTACHMENT B

## Items to be seized

1.      All records relating to violations of 18 U.S.C. §§ 1591(a)(1), Sex Trafficking of a Child, those violations involving Angel Jesus Sanchez-Manriquez, including:

a. Records, images, audio, videos, and communications regarding A.G.;

b. Records, images, audio, videos, and communications regarding the management of prostitution activity.

c. Records, images, videos, and communications regarding the advertisements of acts of prostitution, including use of Skipthegames.com.

d. Records, images, videos, and communications regarding hotel reservations;

e. Hotel room keys;

f. Records, images, audio recordings, videos, and/or communications regarding the physical location of (and transportation to and from) prostitution encounters, including stored geolocation information;

g. Information related to recruitment or potential recruitment of individuals for the purpose of prostitution, including social media accounts that may have been used to engage in such recruitment;

h. Condoms;

i. Sex toys;

j. Any cell phone, computer, or electronic storage media currently or previously assigned call number 209- 420-2671 and/or 530-638-2760;

k. Firearms and/or ammunition;

l. U.S. mail addressed to A.G.;

m. Clothing, identification, and/or electronic devices that belonged to individuals who engaged in prostitution.

n. Records, images, videos, and communications regarding any travel involving A.G. for the purpose of engaging in prostitution;

s. United States currency that is the proceeds of prostitution;

t. Indicia of occupancy, residency, control or ownership of the premises and the things described in this warrant, including utility bills, telephone bills, loan repayment receipts, rent documents, envelopes and keys, photographs, and bank records;

2.      Computers or storage media used as a means to commit the violations described above, including computers or storage media used to manage prostitution.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

4. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | )    Case No.  2:20-sw-1156-DB |
| Angel Jesus Sanchez-Manriquez | ) |
| | ) **SEALED** |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

       **YOU ARE COMMANDED** to execute this warrant on or before ___ January 2, 2021 ___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

       Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

       The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
      ☐ for ___ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     ___ 12/19/2020, 3:30pm ___

City and state:     ___ Sacramento, California ___     _____
                                            DEBORAH BARNES
                                    UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____         _____
Signature of Judge                                                              Date